UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LEW MICHAEL BETTELYOUN,<br><br>Defendant. | 5:18-CR-50114-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress (Doc. 75). A hearing was held on Wednesday, April 7, 2021. Defendant was personally present and represented by his attorney of record, Terry Pechota. The Government was represented by the Assistant United States Attorney Kathryn Rich. Four witnesses testified at the hearing, and eleven exhibits were received into evidence. Supplemental briefing concluded on 6/3/2021. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## **JURISDICTION**

Defendant is charged in a Superseding Indictment with Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1),

and 841(b)(1)(A), Carrying a Firearm During a Drug Trafficking Offense in violation of 18 U.S.C. § 924(c)(1)(A)(i), and Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and United States District Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

In March of 2015, the Badlands Safe Trails Drug Task Force ("Task Force") began investigating Defendant Lew Bettelyoun for distributing drugs out of his home near Pine Ridge, South Dakota.  The Task Force operates with a small number of agents from the BIA, FBI, and Oglala Sioux Tribe, and primarily focuses on drug conspiracy investigations.  BIA Special Agent ("SA") Justin Hooper was a member of the Task Force during the investigation into Lew Bettelyoun, and he participated in that investigation.  The court finds SA Hooper's testimony credible.

From March, 2015, until March, 2016, officers with the Task Force communicated with five separate sources of information ("SOI") regarding the Defendant's drug activities.  These SOIs informed the Task Force that the Defendant was receiving methamphetamine from at least two sources and selling it from his home.  The Task Force concealed the SOIs' identities because they were either actively cooperating with law enforcement or did not wish to be identified.

On June 3, 2016, SA Hooper was contacted by Officer Jon Archambault with the Oglala Sioux Tribe Department of Public Safety (OSTDPS). He stated that they had received a call for a wellness check on children residing with the Defendant. The caller was concerned that the Defendant, or others within the residence, were using methamphetamine in the presence of the children.

OSTDPS Officers Archambault and Alec Morgan, Jr. responded to the call at approximately 6:00 p.m. on June 3, 2016. While inside the residence, the officers noticed several indicia of drug use and activity. The Defendant, Mr. Bettelyoun, repeatedly laid down and stood back up, was speaking rapidly and in incomplete sentences, was grinding his teeth, and appeared to have sweaty and "clammy" skin. Another individual found in the residence, Lyle (last name unknown), was found in the bathroom. Upon exiting the bathroom, Lyle continued to stare at the toilet, as if making sure that it would flush. Officer Morgan checked the toilet after Lyle left the bathroom and noticed a white powdery substance in the toilet. A third individual, later identified as Meco Goings, was found in the first bedroom. Mr. Goings also appeared "clammy" and had red, bloodshot eyes. Within the bedroom, Officer Morgan found two glass mirrors taped to a bar, a device known to SA Hooper to be commonly used to cut and snort controlled substances. A fourth individual, Myrtle Cedar Face, was in the living room. During the search of the home, officers noticed Ms. Cedar Face sweeping the floor in the kitchen, even though they could not see any dirt in the area she was sweeping. She also appeared to the officers to be nervous and fidgety. The officers also noticed a surveillance camera

3

monitoring the entrance of the residence, an item known to SA Hooper to be common among drug traffickers.  SA Hooper included these observations and the information from the five confidential SOIs in an affidavit and submitted it alongside a search warrant application for the defendant's residence to the undersigned magistrate judge on June 7, 2016.

This magistrate judge, finding probable cause, issued the search warrant on June 7, 2016.  On June 16, 2016, SA Hooper and other officers with the Task Force executed the search warrant at the Defendant's residence.  Several items were seized during the execution of the search warrant, which are listed in the Return, filed at Doc. 89 on p. 18.  At the conclusion of the execution of the search warrant, Mr. Bettelyoun was arrested on tribal charges and transported to the adult offenders facility in Pine Ridge, South Dakota.

On June 17, 2016, SA Hooper was informed by OSTDPS that the Defendant wished to speak to them.  That same day, SAs Hooper and Dane Rasmussen went to the adult offenders facility to speak with the Defendant.  SA Hooper testified at the hearing on this motion that if the Defendant had not requested to speak with them, they would not have interviewed the Defendant.

At the beginning of the interview, SA Hooper read each item of a standard Miranda Warning and Waiver form to the Defendant.  After reading each right, SA Hooper asked the Defendant if he understood the right, and then marked a box indicating his response.  The Defendant indicated that he understood each of his Miranda rights and was willing to waive those rights

4

and talk to SAs Hooper and Rasmussen.  This form in found at Doc. 89, Ex. 2 at p. 22.

The interview lasted approximately an hour and fifteen minutes.  During the course of the interview, the Defendant made several inculpatory statements.  SA Hooper testified that at the time of the interview, the Defendant appeared calm and gave coherent answers, and nothing about his answers or demeanor suggested that he was under the influence of either drugs or alcohol.  The interview concluded when the Defendant stated that he did not wish to speak anymore and was returned to his cell.  The interview was not recorded, but SA Rasmussen authored a written report, which was given to tribal authorities.  The Defendant was then brought before the tribal court; however, the resolution of his case in tribal court is unknown.

The Defendant remained under investigation by the Task Force, and in the summer of 2018, two controlled buys were conducted.  The first one was conducted by SOI #7 on July 17, 2018.  During this interaction, SOI #7 met with the Defendant and another individual, Leslie Horse, at the Defendant's home.  SOI #7 paid $200 for what, upon testing by the Rapid City Police Department, was determined to be approximately 2 grams of methamphetamine.  SOI #7 conducted another controlled buy at the Defendant's residence on August 8, 2018, this time purchasing $150 of methamphetamine.

The Task Force also received information from SOI #6 in July and August of 2018 that corroborated information known to the Task Force through their

observations and from the other SOIs.  This information was compiled in an affidavit authored by SA Cooper and submitted to the undersigned magistrate judge, who, upon finding probable cause, issued a search warrant for the Defendant's residence on September 28, 2018.  At the time, the Defendant also had an arrest warrant due to a federal indictment issued in September, 2018.

SA Cooper testified that the search warrant was executed by agents of the Task Force on October 3, 2018.  The court finds SA Cooper's testimony to be credible.  OSTDPS Officers Puckett and Archambault made first contact with the Defendant, who was outside mowing his lawn at the time.  Upon seeing the marked police vehicle, the Defendant attempted to hide behind a playground, but eventually came back out and approached the officers.  The officers informed him that they were there to execute a warrant and placed him under arrest.  The Defendant was then handcuffed and placed in the front passenger seat of SA Cooper's marked cruiser.

SA Cooper was not in uniform, but was identifiable as law enforcement, and was armed.  The Defendant appeared somber, but calm and coherent, and SA Cooper testified he had no reason to believe he was under the influence.  SA Cooper read the Defendant his Miranda rights from a standard Warnings and Waiver form that was placed between SA Cooper and the Defendant, so both were able to read the form.  After each right, the Defendant indicated that he understood and was still willing to talk to SA Cooper.  The Defendant did not sign the form, which is found at Doc. 89, Ex. 9. The Defendant was then transported to the Pine Ridge tribal jail for the duration of the execution of the

search warrant.  After the search warrant was fully executed, the Defendant was transported to Rapid City.  Both transports were audio recorded and are found at Ex. 4.

During the execution of the search warrant, law enforcement found several incriminating items, both inside the house and inside boxes near the playground the Defendant initially hid behind.  Photographs of many of the items, as well as the Return listing all seized items, are entered into evidence at exhibits 3, 5-8.

Additional relevant facts are set forth in the appropriate sections addressing the Defendant's arguments.

## **DISCUSSION**

### **1. June 16, 2016, Search of the Defendant's Residence.**

The Defendant first argues the search and seizure that occurred at the defendant's residence on June 16, 2016, should be suppressed because the affidavit in support of the search warrant lacked probable cause; the affidavit was not based upon information from a reliable source; and the information relied upon was stale.  (Doc. 75).

The government responds that the affidavit contained information of an incident that occurred only 4 days before the search was authorized, therefore the affidavit was not stale.  (Doc. 81).  They also contend that the information in the affidavit is from several reliable sources, i.e. their confidential SOIs, and that their testimonies are corroborated by each other and by information observed by law enforcement.  Lastly, they argue the search warrant provided

enough information to establish a "fair probability that evidence of drug trafficking would be found in the defendant's residence." Id.

### A. The Search Warrant Did Not Lack Probable Cause.

A search warrant is supported by probable cause if the supporting affidavit presents a fair probability that evidence or contraband will be found in the location to be searched.  See United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995).  Supporting affidavits must be read in a common-sense fashion and should be evaluated based on the totality of the circumstances.  E.g., id.; United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995).  "Deference is accorded an issuing magistrate's probable cause determination."  United States v. Brown, 584 F.2d 252, 256 (8th Cir. 1978).[1]

Here, the Defendant provides no argument or evidence as to why the supporting affidavit is insufficient.  The supporting affidavit spans ten pages and includes information from five separate sources of information, all of which are corroborated by similarities amongst themselves, as well as observations by law enforcement.  It also includes a detailed account of the events occurring and observations made at the wellness check conducted by OSTDPS Officers Archambault and Morgan on June 3, 2016.  The affidavit described several indicators of drug usage, including nervous behavior, physical indicators (grinding teeth, rapid speech, bloodshot eyes, clammy skin, and fidgety), white

---

[1] Magistrate judges may properly issue report and recommendations regarding search warrants they previously authorized.  See United States v. Campbell, No. 12-CR-40039-KES, 2012 WL 6042757 (D.S.D. Dec. 5, 2012) (adopting R&R of magistrate judge who also issued search warrant challenged in suppression motion).

powdery substance in the toilet bowl, and security cameras watching the entrance of the residence.

The supporting affidavit presented more than a "fair probability" that evidence of drug trafficking would be found in the defendant's residence. Therefore, the search warrant did not lack probable cause.

### B. The Affidavit Was Supported by Information from a Reliable Source.

The Supreme Court has recognized "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. 53, 59 (1957). The Court explained the privilege exists to protect "the public interest in effective law enforcement." Id. Citizens are more likely to report crimes to law-enforcement officials if they are able to remain anonymous. Id. On the other hand, the privilege is not absolute. Id. at 60. If disclosure of an informant's identity "is relevant and helpful to the defense of an accused" or "essential to a fair determination of a cause," disclosure is necessary. Id. at 60–61. The court must weigh these competing interests against each other. United States v. Harrington, 951 F.2d 876, 877 (8th Cir. 1991) (citing Roviaro, 353 U.S. at 59)).

Law enforcement officers must present sufficient information to the judge so that the judge can make an informed and independent determination of probable cause. Franks v. Delaware, 438 U.S. 154, 165 (1978). When search warrant affidavits are based upon information supplied by informants, the key question is whether such information is reliable. United States v. Williams, 10

F.3d 590, 593 (8th Cir. 1993).  Where an SOI's information is corroborated, even in part, by police or by other SOIs, the court may conclude the informant is reliable.  United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see Williams, 10 F.3d at 593 ("If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable").

Furthermore, "[w]hen an informant's information is at least partly corroborated, attacks upon credibility and reliability are not crucial to the finding of probable cause."  United States v. Caswell, 436 F.3d 894, 898 (8th Cir. 2006) (internal quotations and alterations omitted).  Cooperation agreements between informants and law enforcement do not render an affidavit unreliable; in fact, "[j]udicial officers issuing warrants are aware of deals made with informants who themselves are facing charges.  Therefore, failure to inform the issuing officer of a deal is not fatal to the validity of the warrant."  United States v. Wold, 979 F.2d 632, 635 (8th Cir. 1992).

Here, again, the Defendant provides no argument or evidence as to why the informants are unreliable.  The affidavit includes information from 5 different SOIs, each of whom gave very similar information about the Defendant selling methamphetamine out of his residence.  Additionally, as stated above, that information was also corroborated by observations by member of the Task Force during the wellness check on June 3, 2018.  Where an SOI's information is corroborated, even in part, by police or by other SOIs,

the court may conclude the informant is reliable.  Tyler, 238 F.3d at 1039 (8th Cir. 2001).

Additionally, SA Hooper, who authored the affidavit, testified that at the time he wrote the affidavit, he knew the identities of each of the SOIs and had no doubts about the credibility of any of them.  (Doc. 95 at p. 33).  As such, the information contained in the affidavit in support of the search warrant was reliable.

**C. The Information Was Not Stale.**

"There is no bright-line test for determining when information in a warrant is stale."  United States v. Ortiz-Cervantes, 868 F.3d 695, 700 (8th Cir. 2017) (internal citation omitted).  "A warrant becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search.'"  United States v. Brewer, 588 F.3d 1165, 1173 (8th Cir. 2009) (quoting United States v. Palega, 556 F.3d 709, 715 (8th Cir. 2009)).  "Important factors to consider in determining whether probable cause has dissipated . . . include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search."  Id. (quoting United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997)).

Here, again, the Defendant provides no argument or evidence as to why the information contained in the affidavit was stale. The affidavit was authored on June 7, 2016, and included information from a wellness check conducted

11

on the property on June 3, 2016.  While it is true that the SOIs provided information from March, 2015, to March, 2016, that information was part of an ongoing investigation into the Defendant.  Due to the continuing nature of the investigation and the information from the wellness check being only 4 days before the affidavit, the information in the affidavit was not stale.

**2. The June 17, 2016, Statements at the Law Enforcement Center.**

The Defendant next argues his statements made on June 17, 2016 to Agents Hooper and Rasmussen at the Oglala Sioux Law Enforcement Center in Pine Ridge, South Dakota should be suppressed for six reasons. The Defendant argues he was not properly advised of his <u>Miranda</u> rights; he did not voluntarily, knowingly, and intelligently waive his <u>Miranda</u> rights; law enforcement ignored his request to speak to an attorney; his statements were involuntary because he was under the influence of drugs at the time he made the statements; and he was unlawfully interrogated on June 17, 2016 because he was taken into custody on June 7, 2016 and was "not promptly taken before a judicial officer."  (Doc. 75).

The Government responds the Defendant was read his <u>Miranda</u> rights and knowingly, voluntarily, and intelligently waived them, both orally and in writing. They argue there was no indication that the defendant was under the influence of drugs or alcohol at the time he made the statements.  They next argue that the Defendant never requested to speak to an attorney.  Lastly, they argue the Defendant was actually taken into custody on June 16, 2016 and was charged in tribal court, not federal court, so there was no Rule 5 violation.

12

## A. The Defendant Was Properly Advised of His <u>Miranda</u> Rights.

An individual is entitled to an advisement of <u>Miranda</u> when that individual is "taken into custody for questioning." <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th. Cir. 2002) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)). <u>Miranda</u> requires that the individual be advised of "his right to be free from compulsory self-incrimination and his right to assistance of counsel." <u>Id</u>. Here, it is clear that the Defendant was in custody, as he was being held at the Pine Ridge adult offender's facility. It is equally clear that this questioning amounted to an interrogation, as the officers questioned the Defendant for over an hour specifically about his drug activities. The question here is whether the Defendant was informed of his <u>Miranda</u> rights.

Here, again, the Defendant provides no argument or evidence as to how the Defendant was not properly advised of his <u>Miranda</u> rights. SA Hooper testified that, before any substantial questioning occurred, he read the Defendant each of his <u>Miranda</u> rights from a standard Warning and Waiver form. The form was placed in-between him and the Defendant, so both were able to read the form. After each right, the Defendant either, through words or gestures, indicated that he understood the right and was willing to waive the right. The Defendant also signed the form indicating that he understood his rights and wanted to waive them and talk to the officers. The court has accepted into evidence, and the Defendant did not object to, the Defendant's signed <u>Miranda</u> Warnings and Waiver form. See Doc. 89, Ex. 2. Therefore, the Court finds that the Defendant was properly informed of his <u>Miranda</u> rights.

## B. The Defendant Voluntarily, Knowingly, and Intelligently Waived His <u>Miranda</u> Rights.

"Due process requires that confessions be voluntary." <u>United States v. Anaya,</u> 715 F. Supp. 2d 916, 931 (D.S.D. 2010) (citing <u>Brown v. Mississippi,</u> 297 U.S. 278, 285–86 (1936)). "The appropriate test for determining the voluntariness of a confession is 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" <u>United States v. Meirovitz,</u> 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting <u>United States v. Jorgensen,</u> 871 F.2d 725, 729 (8th Cir. 1989)). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." <u>Schneckloth v. Bustamonte,</u> 412 U.S. 218, 225 (1973). "On the other hand, a statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair [her] capacity for self-determination." <u>United States v. LeBrun,</u> 363 F.3d 715, 724 (8th Cir. 2004). The government bears the burden of showing by a preponderance of the evidence that the challenged statements were voluntary. <u>Id.</u>

When assessing whether the defendant's will was overborne, the court considers the conduct of the officers and the characteristics of the accused. <u>Id.</u> Relevant factors include: the defendant's prior experience with law enforcement; the nature of the interrogation, including its duration and location; whether the defendant was in custody or otherwise restrained; whether law enforcement employed hostile tactics; and defendant's intelligence and mental state, which would render her peculiarly susceptible to having her

will overborne.  See, e.g., id. at 726.  A written waiver of Miranda rights is not required; a waiver may be express or implied through conduct, and need not be verified with a signature.  Berghuis v. Thompkins, 560 U.S. 370, 383–85 (2010); North Carolina v. Butler, 441 U.S. 369, 373, 375–76 (1979).

The Eighth Circuit has held "[a] defendant's mental condition alone is not enough to render a confession constitutionally involuntary; there must be coercive police activity[.]" LaRette v. Delo, 44 F.3d 681, 688–89 (8th Cir. 1995).  Likewise, the Eighth Circuit Court of Appeals has repeatedly declined to adopt a *per se* rule that a Miranda waiver made under the influence of drugs is involuntary.  United States v. Goodwin, 242 F.3d 377, 377 (8th Cir. 2000); United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008).  "A statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." Anaya, 715 F. Supp. 2d at 932 (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)).  Rather, the test to determine voluntariness is "whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." Anaya, 715 F. Supp. 2d at 949 (quoting United States v. Pierce, 152 F.3d 808, 812 (8th Cir.1998).  The court considers "the totality of the circumstances, including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." Pierce, 152 F.3d at 812 (internal citation omitted).

15

Here, again, the Defendant provides no argument or evidence as to why the Defendant's waiver of his <u>Miranda</u> rights was involuntary, unknowing, or unintelligent.  The interview occurred at the Pine Ridge adult offender's facility visitation room at the behest of the Defendant.  SA Hooper testified that he and SA Rasmussen would not have interviewed the defendant if he had not requested to talk.  The room was fairly large and included room for multiple tables.  The defendant was calm and collected during the interaction, and the tone of the interview was conversational throughout the roughly hour and 15-minute duration.

The Defendant has no apparent mental deficiencies and is of average intelligence. The Defendant is also well known to law enforcement in the area and has had several interactions with them, and therefore has a heightened familiarity with law enforcement.  SA Hooper testified that he had seen the Defendant under the influence of drugs or alcohol at one point before, and the defendant did not appear under the influence of anything at this time. Although the Defendant argues now that he was under the influence of drugs or alcohol at the time he made the statements, he does not offer any evidence in support of that contention, and the court finds nothing in the record that would support that contention.

Lastly, there was no coercive police behavior during the entirety of the interview. There were no threats, violence or promises.  The officers sat calmly at the table with the Defendant, and when the Defendant asked to terminate

the interview, the officers did so immediately.  The defendant did not ask for an attorney at any point during this interview.

The court finds, under a totality of the circumstances, that the Government has met its burden by a preponderance of the evidence to demonstrate the Defendant's waiver of Miranda was voluntary, knowing, and intelligent.

### C. The Defendant Was Not Unlawfully Held Before Being Taken Before a Judge.

Federal Rule of Criminal Procedure 5(a) states "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer…"  The Federal Rules of Criminal Procedure "govern the procedure in all criminal proceedings in the courts of the United States."  Fed. R. Crim. P. 1.  Therefore, the requirements of Rule 5(a) only apply to defendants arrested and held under federal law.  United States v. Cooke, 853 F. 3d 464, 470 (8th Cir. 2017).  However, Rule 5 may apply when a defendant is held under another law, such as tribal law, "when there is evidence indicating that the arrest and detention by the state [or tribal] official were at the request of federal authorities or for the purpose of assisting them."  Id.  (quoting United States v. Jarrett, 423 F.2d 966, 971 (8th Cir. 1970)).

This case has similarities to the case in United States v. Bull Bear, 18-cr-50076. In that case, a search warrant was executed by both federal and tribal law enforcement and ultimately arrested by tribal officers on murder charges.

The defendant was taken and held at the Pine Ridge adult offender's facility for 8 days before being transported to Rapid City.

However, this case is distinguishable from <u>Bull Bear</u>.  Important in that decision was the fact that the officers intended from the start to charge the defendant under federal law.  The court, in that case, reasoned that because the Oglala Sioux Tribe is only able to punish an individual with a maximum of 3 years imprisonment under 25 U.S.C. 1302(b) and the defendant was charged with murder, the "defendant's 'arrest and detention by [tribal] official[s] were at the request of federal authorities or for the purpose of assisting them.'" <u>Id</u>. (quoting <u>Cooke</u>, 853 F. 3d at 470).

Here, both tribal officers and federal officers carried out the search warrant on the understanding that the defendant would be arrested on tribal charges.  After the Defendant's arrest, it was still the understanding that he would be charged in tribal court, and he was only interviewed by the federal agents at his own request.  The Defendant was not transported or charged in federal court at this time, instead proceeding through the tribal court system. The Defendant was not indicted on federal charges until over two years later, on September 28, 2018.  Because the tribal officers were not acting at the request of or for the purpose of assisting federal authorities, the defendant was not under federal arrest and therefore Rule 5 does not apply.

### 3. May 18, 2020, Search and Seizure at the Defendant's Residence.

The Defendant's third argument is that the search and seizure that occurred at the Defendant's residence on May 18, 2017, should be suppressed

because the documents supporting the search warrant issued by an Oglala Sioux Tribal Judge had not been supplied to the Defendant. However, at the hearing on this motion, the Government stated that they will not introduce any evidence discovered during this search. As such, this argument is denied as moot.

### 4. October 3, 2018, Search and Seizure at the Defendant's Residence.

The Defendant's fourth argument is that the search and seizure that occurred at the Defendant's residence on October 3, 2018, should be suppressed for the same reasons outlined in the defendant's first argument. He also argues the search exceeded the scope of the search warrant. (Doc. 75).

The Government responds that the supporting affidavit provided probable cause and was based upon reliable information. They also contend that the information in the affidavit was not stale, as it includes information establishing a drug trafficking timeline starting in 2016 until the month the warrant was issued, September 2018. Lastly, they respond that the Defendant has not pointed to any facts to support his contention that law enforcement exceeded the scope of the search warrant.

### A. The Search Warrant was Supported by Probable Cause.

The legal standard discussed in Section 1A, *infra*, applies to this section as well. In the interest of brevity, it will not be repeated here.

Here, the search warrant was supported by probable cause. This affidavit in support of the search warrant, like the affidavit in support of the search warrant executed on June 16, 2016, includes information from seven

SOIs in this case.  Each of these SOI's information corroborates each other, with each of them providing very similar, detailed information about the drug trafficking activities of the Defendant.

The affidavit also contains information that SOI #7 conducted two controlled buys on behalf of law enforcement from the Defendant; one on July 17, 2018, in the amount of $200, and one on August 8, 2018 in the amount of $150.  The substances purchased in both controlled buys were analyzed by the Rapid City Police Department Evidence Section.  The substance from the first buy was determined to be methamphetamine, and the results from the second buy were still pending at the time the affidavit was authored.

The affidavit also included information from several interactions between law enforcement and the Defendant.  One of these interactions is the search of the Defendant's residence that occurred on June 16, 2016.  This search yielded multiple items of drug paraphernalia and a shotgun which had been reported stolen.  Subsequent to the execution, the Defendant also made multiple inculpatory statements involving drug trafficking.  The affidavit also included information from an interaction on May 18, 2017, in which officers of the OSTDPS responded to the Defendant's residence.  The Defendant's significant other, Leslie Horse, informed the officers the Defendant was selling drugs from his "man cave."  Several drug paraphernalia items were seized from the residence on this date as well.

Lastly, the affidavit included information that on September 18, 2018, a federal grand jury indicted the Defendant on drug trafficking charges.  The

supporting affidavit presented more than a "fair probability" that evidence of drug trafficking would be found in the defendant's residence.  Therefore, the search warrant did not lack probable cause.

### B. The Affidavit Was Supported by Information from a Reliable Source.

The legal standard discussed in Section 1B, *infra*, applies to this section as well. In the interest of brevity, it will not be repeated here.

Here, the affidavit was supported by information from multiple reliable sources.  The affidavit included information from seven SOIs, all of whom provided similar information about the Defendant selling drugs from his residence. Not only do the separate SOIs corroborate each other, their information is also corroborated by information provided by law enforcement through their several interactions with the Defendant. Where an SOI's information is corroborated, even in part, by police or by other SOIs, the court may conclude the informant is reliable.  Tyler, 238 F.3d at 1039 (8th Cir. 2001).

Additionally, SA Cooper, who authored the affidavit, testified that at the time he wrote the affidavit, he knew the identities of each of the SOIs and had no doubts about the credibility of any of them.  (Doc. 95 at p. 56).  As such, the information contained in the affidavit in support of the search warrant was reliable.

### C. The Information Contained in the Affidavit was Not Stale.

The legal standard discussed in Section 1C, *infra*, applies to this section as well. In the interest of brevity, it will not be repeated here.

Here, the information contained in the affidavit in support of the search warrant was not stale.  Although the affidavit included information starting from March, 2016, it also included information leading all the way up until September, 2018, the month the search warrant was issued. The information established an ongoing timeline of the investigation into the Defendant. Additionally, the two controlled buys conducted by SOI #7 occurred in July and August of 2018, just one and two months before the search warrant was issued.

Due to the continuing nature of the investigation and the fact that information from the controlled buys and other information from SOI #7 was provided the same month the search warrant was issued, the information was not stale.

### D. The Search Did Not Exceed the Scope of the Search Warrant.

The Defendant argues the search warrant in this case "did not authorize the search of outbuildings nor any packages or containers found outside the residence."  On the contrary, the search warrant expressly authorized the search of "any out-buildings and vehicles located within the curtilage area of the residence."  (Doc. 89, Ex. 3).  If the playhouse that was searched can be considered an outbuilding, it was certainly within the curtilage of the residence, and therefore authorized under this search warrant.  The playhouse was located directly beside the house, and clearly within the curtilage.  (See Doc. 89, Ex. 5).

Additionally, the search warrant also expressly authorized the search of "[a]ll items determined to have been used or likely to be used for...storage... of any controlled substance." (Doc. 89, Ex. 3). Given the fact that the Defendant immediately went to the playhouse upon seeing the officers, and the fact that the officers were there to execute a search warrant for evidence of drug trafficking, it was likely that any containers in that area would be used for storage of a controlled substance. Therefore, this search was also within the scope of the search warrant.

The Defendant also argues that the contents of any cell phone that was seized required a separate search warrant. The search warrant expressly authorized the search of "[c]ell phones, tablets, and computers capable of being used to facilitate or document the distribution, sales, trafficking, or possession of controlled substances along with any and all information contained on these devices..." Id. This clearly authorizes not only the seizure of the cell phones, but also the search of their contents. Therefore, the Defendant's argument that the search of the contents of the cell phones is also without merit.

### 5. October 3, 2018, Statements at the Defendant's Residence

The Defendant argues the statements he gave at his residence after being arrested on October 3, 2018, should be suppressed for the same reasons outlined in his second argument. (Doc. 75).

The Government responds that the Defendant was informed of his Miranda rights and waived them orally. (Doc. 81). They also argue that SA Cooper did not coerce the Defendant to waive his Miranda rights and there is

23

no indication the Defendant was under the influence of drugs or alcohol at the time he made the statements.  <u>Id</u>.  They also refute the argument that any request by the Defendant for an attorney was ignored by law enforcement and that there was a Rule 5 violation.  <u>Id</u>.

**A. The Defendant Was Properly Advised of His <u>Miranda</u> rights.**

The legal standard discussed in Section 2A, *infra*, applies to this section as well.  In the interest of brevity, it will not be repeated here.

Here, again, the Defendant was properly advised of his <u>Miranda</u> rights.  Immediately upon his arrest, the Defendant was brought to SA Cooper, who placed him in the front seat of his cruiser.  The very first thing SA Cooper did was inform the Defendant of his <u>Miranda</u> rights.  A standard <u>Miranda</u> Warnings and Waiver form was placed between SA Cooper and the Defendant, so both were able to read the form.  After SA Cooper read each right, the Defendant indicated that he understood the right and at the end, indicated that he wished to waive those rights and speak to SA Cooper.  Because he was handcuffed, the Defendant indicated that he could not, or did not want to, sign the Warnings and Waiver form.  However, it is not required that a <u>Miranda</u> wavier be given in writing; an oral waiver is sufficient.  As such, the court finds that the Defendant was properly advised of his <u>Miranda</u> rights and orally waived his rights.

**B. The Waiver was Voluntarily, Knowingly, and Intelligently Given**

The legal standard discussed in Section 2B, *infra*, applies to this section as well.  In the interest of brevity, it will not be repeated here.

24

Here, again, both the characteristics of the Defendant and the conduct of the officer weigh in favor of voluntariness.  The court, having reviewed the audio recording of the interaction and read the transcript of the interaction, finds the Defendant's demeanor was calm and his answers were coherent throughout the interaction.  The Defendant has no apparent mental deficiencies and is of average intelligence.  The Defendant is also well known to law enforcement in the area and has had several interactions with them, and therefore has a heightened familiarity with law enforcement.

SA Cooper also testified that, at the time of the interaction, he had no reason to believe the Defendant was under the influence of drugs or alcohol.  Although the Defendant argues he was under the influence of drugs or alcohol at the time he made the statements, he does not offer any evidence in support of that contention, and the court finds nothing in the record that would support that contention.

SA Cooper was calm and respectful throughout the interaction. He made no threats or promises and did not employ any strongarm or deceptive tactics. The Court has not found, and the Defendant has not pointed to, anything in the record that would indicate any coercive police activity that would render these statements involuntary.

The court finds, under a totality of the circumstances, that the Government has met its burden by a preponderance of the evidence to demonstrate the Defendant's waiver of Miranda was voluntary.  See LeBrun, 363 F.3d at 724.

25

### C. The Defendant Was Not Unlawfully Held Before Being Taken Before a Judge.

The legal standard discussed in Section 2C, *infra,* applies to this section as well.  In the interest of brevity, it will not be repeated here.

Here, the Defendant was transported to the Pine Ridge adult offender's facility on October 3, 2018 at approximately 8:30 a.m. where he stayed for the duration of the execution of the search warrant. The execution of the search warrant concluded around 11 a.m., and at about 12:45 p.m., the transport to Rapid City began.

The Defendant then had his initial appearance before this magistrate judge on October 5, 2018 at 1:20 p.m. (See Doc. 9).  The court finds that this approximate twenty-nine hour gap between the Defendant's arrest and his initial appearance does not amount to an "unreasonable delay."  Therefore, Fed. R. Crim. P. 5(a) was not violated.

### 6. October, 3, 2018, Statements in SA Cooper's Vehicle

Lastly, the Defendant argues in his post-hearing brief that the statements he gave to SA Cooper in his vehicle on October 3, 2018, should be suppressed because they were involuntary.  He argues being in the vehicle with SA Cooper for an hour and a half during the transport from Pine Ride to Rapid City amounted to "physical coercion" sufficient to render the statements involuntary.  (Doc. 93).

The Government responds that there is no evidence of SA Cooper attempting to coerce the Defendant into waiving his Miranda rights, or any

26

coercive behavior at all.  They argue this situation as nothing more than a routine transport.  (Doc. 96).

The legal standard discussed in Sections 2B and 5B, *infra*, applies to this section as well. In the interest of brevity, it will not be repeated here. Additionally, the portion of the analysis concerning the "characteristics of the accused" set out in section 5B, *infra*, remain the same.  These statements were given shortly after the statements given at the Defendant's residence earlier the same day.  The "characteristics of the accused," as above, lean in favor of voluntariness.  As such, this section will address whether the conduct of the SA Cooper amounted to pressures sufficient to overbear the Defendant's will.

The Defendant argues SA Cooper physically coerced the Defendant by "interrogating [him] for an hour and a half in a locked automobile in an attempt to secure a waiver of Miranda rights and incriminating statements," thereby rendering any such statements involuntary.  The court, having reviewed the audio, finds that the overwhelming majority of the transport was spent in silence. The portions of the transport in which the Defendant and SA Cooper did communicate were to answer questions posed by the Defendant.

SA Cooper did not threaten or promise anything to the Defendant and did not employ any deceptive or strongarm tactics to get the Defendant to make any statements.  The argument that being in a "locked vehicle" for an hour and a half supports the contention that he was physically coerced is also without merit.  The Defendant was being transported from Pine Ridge to Rapid City.

27

The court finds that any statements made during the transport from Pine Ridge to Rapid City were voluntary.

The court finds that any statements made during the transport from Pine Ridge to Rapid City were voluntary.

## CONCLUSION

For the aforementioned reasons, it is respectfully RECOMMENDED that Defendant's Motion to Suppress (Doc. 75) be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 17th day of August, 2021.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge

28