UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> LEW MICHAEL BETTELYOUN, <br><br> Defendant. | CR. 18-50114-JLV <br><br><br> ORDER |

## INTRODUCTION

On October 23, 2018, a grand jury indicted defendant Lew Michael Bettelyoun for conspiracy to distribute a controlled substance, carrying a firearm during a drug trafficking offense and possession of a firearm by a prohibited person. (Docket 17). In February 2021, upon a showing of good cause, the court permitted defendant to file an untimely motion to suppress. (Docket 74). Defendant filed his motion to suppress and a supporting memorandum on March 1, 2021. (Docket 75). The government filed a response opposing the motion. (Docket 81). The motion was referred to Magistrate Judge Daneta Wollmann pursuant to 28 U.S.C. § 636(b)(1)(B) and the court's April 1, 2018, standing order. The magistrate judge conducted an evidentiary hearing on April 7, 2021. (Docket 86). Defendant filed a post-hearing brief in support of his motion to suppress on May 27, 2021. (Docket 93). The government filed a response to defendant's post-hearing brief on June 3, 2021. (Docket 96).

On August 17, 2021, Judge Wollmann filed a report and recommendation ("R&R") recommending the court deny defendant's motion to suppress.  (Docket 97).  Mr. Bettelyoun filed objections to the R&R.  (Docket 98).  The government filed a response opposing Mr. Bettelyoun's objections and urging the court to adopt the R&R.  (Docket 99).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  Id.  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  Id.; see also Fed. R. Crim. P. 59(b)(3).

The court reviewed *de novo* those portions of the R&R to which objections were filed, the transcript of the evidentiary hearing, the parties pre- and post-hearing briefing and exhibits submitted.  For the reasons given below, the court overrules defendant's objections, adopts the R&R and denies defendant's motion to suppress.

## DEFENSE OBJECTIONS

Defendant makes fourteen objections to the R&R, some factual and some legal.  They are as follows:

1. Defendant argues "[f]ive sources of information (SOI) over the period of one year is not sufficient [information upon which] to base any search or seizure."  (Docket 98 at p. 1).

2

2. Defendant asserts entrance into his residence by law enforcement on June 3, 2016, was "based on hearsay and speculation and conjecture." Id.  He contends the "[p]hysical manifestations" of drug use by four individuals, including the defendant, observed by law enforcement while they were in defendant's residence were "subjective, self serving observations" and "lack any indicia of reliability." Id.

3. Defendant argues the search warrant subsequently issued on June 7, 2016, and executed on June 16, 2016, was not supported by probable cause. Id.  He contends the reliability of the information upon which it was based, including information provided by the five SOIs which are the subject of his first objection, and information from an "anonymous calle[r]" who reported "children were in a house where drugs were present" was not established and "the facts were stale." Id.

4. Defendant argues "the totality of the circumstances" when he made statements to Agents Justin Hooper and Dane Rasmussen on June 17, 2016, after he had been arrested on tribal charges and while he was in tribal custody at the Oglala Sioux Tribe adult offenders facility in Pine Ridge, South Dakota, "do no[t] establish" the statements were made voluntarily.  Id. at p. 2.  He contends the Miranda[1] form used by Special Agents Hooper and Rasmussen "was thrust upon [him]" and there was no "inquiry[] or testimony at the hearing[] as to whether [he] knowingly and intelligently waived his rights or . . . about [his] intelligence, education, criminal history, or whether [he] was under the influence of drugs." Id.

5. Defendant argues the "[t]wo controlled buys on July 17, 2018, and August 8, 2018, and uncorroborated testimony of a SOI in July and August, 2018, were stale, uncorroborated, and were insufficient to establish probable cause for the search warrant issued on September 28, 2018, and executed on October 3, 2018." Id.

6. Defendant argues there was "insufficient evidence to establish [he] attempted to hide when the search warrant was executed on October 3, 2018." Id.

7. Defendant argues the evidence does not establish he "knowingly and intelligently waived his rights" before he was "interrogated by Agent

---

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

Dan Cooper on October 3[, 2018,] at [his] residence." <u>Id.</u>  He asserts "[t]here was no inquiry [into] whether he knowingly and intelligently waived his rights or about his intelligence, education, or criminal history," and there was "insufficient evidence to conclude [he] was not under the influence of drugs or alcohol" at the time of the interrogation.  <u>Id.</u>  He states "[n]o urine or blood test was administered [to him] to establish such" evidence.  <u>Id.</u>  He also contends that, before the interrogation began, a "form was thrust upon him to sign indicating that he waived his Miranda rights," which he "refused to sign," but "the interrogation continued" anyway.  <u>Id.</u>

8. Defendant argues a "29 hour delay after [he] was arrested on October 3, 2018, before he was taken before the Magistrate is unreasonable under [Fed. R. Crim. P.] 5(a)," thereby "invalidat[ing] any statement taken from [him] on that day."  <u>Id.</u>

9. Defendant argues his statements to Special Agents Hooper and Rasmussen on June 17, 2016, are "inadmissible" because there is "no evidence establish[ing he] was ever charged in tribal court and no paperwork produced to show that he was not in federal custody" at that time.  <u>Id.</u> at p. 3.  He bases his argument on the fact he "was at all relevant times being investigated by the Badlands Drug Task Force, which is comprised of [Bureau of Indian Affairs] (federal), [Federal Bureau of Investigation] (federal), and Oglala Sioux Tribe agents," and, therefore, he asserts he "should have been promptly taken before a federal magistrate."  <u>Id.</u>

10. Defendant argues the federal search warrant issued on September 28, 2018, and executed on October 3, 2018, "did not define a curtilage nor did it define what buildings outside the residence were permitted to be searched."  <u>Id.</u>

11. Defendant objects to the magistrate judge's finding that the search warrant executed on October 3, 2018, "authorized the search and seizure of the containers" found in the curtilage of his residence.  <u>Id.</u>  He argues there "the search warrant did not authorize the search" of any of the containers, and "[t]here was absolutely no evidence upon which to base any conclusion that any [of the] containers . . . would contain illegal substances."  <u>Id.</u>  "Even if the warrant authorized the seizure" of the containers, he argues, "a separate warrant would be required to seize any [of their] contents."  <u>Id.</u>

12. Defendant concedes the search warrant executed on October 3, 2018, "may have authorized the seizure of cell phones," but he objects to the magistrate judge's finding that it "[authorize[d] the search and seizure of any contents of the phone[s]." Id.

13. Defendant argues the "totality of circumstances" on October 3, 2018, when he was transported by law enforcement from Pine Ridge to Rapid City, "a nearly 1.5 hour trip," do not establish that he knowingly and voluntarily waived his Miranda rights and, therefore, all statements made by him to Agent Cooper during that trip must be suppressed. Id. at pp. 3-4.

14. Defendant argues his "right to a fair trial and an independent, neutral Magistrate" has been violated because the federal warrants executed at his residence on June 16, 2016, and October 3, 2018, and at issue in this case were "issued by the same Magistrate who then passed upon their validity" by conducting the evidentiary hearing and issuing the R&R on his motion to suppress. Id. at p. 4.

The court addresses each of the defendant's objections in turn.

## ANALYSIS

### 1. Sufficiency of Five Sources of Information Over One-Year Period to Establish Probable Cause to Conduct a Search and Seizure

"For a search warrant to be valid, the warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, [or] contraband . . . may be found in the place to be searched." United States v. Montgomery, 527 F.3d 682, 686 (8th Cir. 2008) (quoting United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007) (internal quotation omitted)). "Probable cause means a 'fair probability' that the object of the search warrant may be found in the place to be searched.' " Montgomery, 527 F.3d at 686 (quoting Illinois v. Gates,

462 U.S. 213, 236 (1983)).  "This determination is made by considering the totality of the circumstances."  <u>Montgomery</u>, 527 F.3d at 686.

In his first objection, the defendant does not appear to challenge the reliability, veracity or bases of knowledge of the five sources of information, but rather the sufficiency of the number of sources of information relative to the period of time over which those sources provided information to law enforcement.  <u>See</u> <u>generally</u> <u>United States v. Oliver</u>, 950 F.3d 556, 564 (8th Cir. 2020) ("When [an] affidavit is based on information from an informant, the informant's reliability, veracity and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search.").  Defendant cites no legal authority for the proposition that five sources of information over a one-year period is patently insufficient to support probable cause for any search or seizure.

The court notes that the five sources of information discussed in the affidavit supporting law enforcement's request for the June 2016 search warrant independently provided information corroborating each other.  <u>See</u> Docket 1-1 at pp. 8-9.  Additionally, the court rejects the implication inherent in defendant's objection that it was *only* the information provided by the five sources of information which provided probable cause for the June 2016 search of defendant's residence.  The information from the five sources was coupled with and further corroborated by additional information provided in the affidavit about law enforcement's own observations of the defendant's

6

activities at a residence nearby the defendant's where agents suspected narcotics trafficking was occurring, as well as law enforcement's observations of the defendant's and three other individuals' behavior indicating drug use during a wellness check conducted at the defendant's residence shortly before the issuance and execution of the June 2016 search warrant.  See id. at p. 9. All of this information together—i.e., the totality of the circumstances— supports a finding that there was a fair probability evidence of illegal narcotics possession and distribution would be discovered at the defendant's residence and, therefore, probable cause existed for the June 2016 search of defendant's residence.  See Montgomery, 527 F.3d at 686.  Defendant's first objection is overruled.

### 2. Entrance by Law Enforcement into Defendant's Residence and Observations by Law Enforcement of Alleged Drug Use by Occupants on June 3, 2016

Law enforcement visited the defendant's residence on June 3, 2016, after Oglala Sioux Tribe Department of Public Safety (OSTDPS) Officer Jon Archambault received a complaint there were individuals smoking methamphetamine at the residence in the presence of children and a request for a welfare check to be conducted at the residence.  (Docket 81-1 at p. 5). Officer Archambault and OSTDPS Officer Alec Morgan, Jr., arrived at the residence on the evening of June 3 to conduct a welfare check.  Id.  After Officers Archambault and Morgan knocked, the defendant opened the door and agreed to let the officers into the residence to look for the children.  Id. at p. 6.

7

While inside the residence, officers Archambault and Morgan observed Mr. Bettelyoun had bloodshot eyes and sweaty or clammy skin, spoke rapidly and in incomplete sentences, repeatedly laid down on the couch and got up again and repeatedly moved his jaw back and forth. Id. Officer Morgan, who had previously interacted with Mr. Bettelyoun, believed this was abnormal behavior for Mr. Bettelyoun. Id. They also observed another individual at the residence with bloodshot eyes and clammy skin. Id. at p. 7. And when they asked a third individual who was in the bathroom to go to the living room while they checked the house, Officer Morgan observed that individual flushing the toilet first and watch it as it flushed before going to the living room. Id. Officer Morgan checked the toilet bowl and saw a powdery white substance. Id. Law enforcement observed a fourth individual pacing in the front of the residence with a broom and sweeping the floor in the kitchen before she went into the hallway and walked around as if she were looking for something. Id. The officers did not notice any dirt on the floor and observed that this fourth individual was fidgety and talking quickly, as if nervous. Id. The officers did not find any children at the residence and left. Id.

Officers Archambault and Morgan subsequently conveyed the information about their observations of the residence and its four occupants, including the defendant, to Bureau of Indian Affairs Special Agent Hooper. Special Agent Hooper applied for the June 2016 warrant to search the defendant's residence shortly thereafter and included the information in his

application for the warrant.  At the evidentiary hearing, Special Agent Hooper testified consistently with the information he had provided in the application for the June 2016 search warrant.  See Docket 92 at pp. 28-30, 34-36 & 39. Mr. Bettelyoun was already being investigated by the Badlands Drug Task Force for distribution of methamphetamine when the OSTDPS received the complaint about methamphetamine use in the presence of children at the defendant's residence and the request for officers to conduct a welfare check. See id. at p. 39.  The information conveyed by the responding officers who conducted the welfare check on June 3, Officers Archambault and Morgan, about their own observations of what they believed to be evidence of methamphetamine use by the four individuals present at the residence that day, including the defendant, further corroborated information Special Agent Hooper already had from his own investigative work and the collective investigative work of other officers on the task force.  See id.

Contrary to the defendant's objection that the information conveyed by Officers Archambault and Morgan to Special Agent Hooper lacked any indicia of reliability, the court finds the consistencies between the information gathered by task force members prior to June 3, 2016, and by Officers Archambault and Morgan on June 3 during the welfare check lend credibility and reliability to the latter.  Furthermore, because Mr. Bettelyoun opened the door to Officers Archambault and Morgan on June 3 and gave them permission to enter the residence to conduct a welfare check, his objection that law

9

enforcement's entrance into his residence on that date was based on hearsay, speculation and conjecture is immaterial.  Mr. Bettelyoun does not refute the fact he granted the officers permission to enter his residence on June 3, nor is there any evidence in the record that contradicts that fact.  Defendant's second objection is overruled.

### 3. Legality of June 2016 Search Warrant

As stated above, "[f]or a search warrant to be valid, the warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, [or] contraband . . . may be found in the place to be searched."  Montgomery, 527 F.3d at 686 (quoting United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007) (internal quotation omitted)).  "Probable cause means a 'fair probability' that the object of the search warrant may be found in the place to be searched.' "  Montgomery, 527 F.3d at 686 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "This determination is made by considering the totality of the circumstances."  Montgomery, 527 F.3d at 686.

Furthermore, "[t]here is no bright-line test for determining when information is stale."  United States v. Jeanetta, 533 F.3d 651, 655 (8th Cir. 2008) (internal quotation omitted).  "In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale."  Id. (internal quotations omitted).  The "timeliness of the information depends

on the circumstances of the case, including the nature of the crime under investigation and the property sought in the search." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). The passage of time is less important "when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." United States v. Johnson, 848 F.3d 872, 877 (8th Cir. 2017) (internal quotations omitted).

Invariably, when the Eighth Circuit found months-old information not stale, the cases have involved suspected criminal activity of an ongoing nature and additional, more recent corroborating information. See e.g., United States v. Kattaria, 553 F.3d 1171, 1176 (8th Cir. 2009) (finding two-year-old information that the defendant had a marijuana grow operation in the basement of his residence not stale where it was corroborated in the couple of months just prior to the issuance of a warrant by law enforcement's check of utility records at the residence which "showed recent, abnormally high electric power consumption"); United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008) (finding information from an "investigation into drug trafficking at [the defendant's] residence . . . collected over several years" not stale when it was corroborated by "a controlled buy of methamphetamine from the defendant at his residence," directed and observed by law enforcement, "only one day before [law enforcement] applied for [a] search warrant"); United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995) (finding information in a case alleging possession of a firearm by a prohibited person that was four years old not stale when it

11

was "augmented and confirmed" by additional testimonial evidence just "four months prior to the execution of [a] warrant" that the defendant "continued to carry [a firearm] in his briefcase and store [] additional firearms in [a] safe"); United States v. Luloff, 15 F.3d 763, 767 (8th Cir. 1994) (finding information of drug transactions that was more than a year old not stale when combined with additional, corroborating evidence from confidential informants "showing that [the defendant] continued to engage in drug trafficking" continuously from the time of the earlier information "until the time of the search").

As discussed in the court's analysis of the defendant's first objection, the application for the June 2016 search warrant included information provided to law enforcement from five sources of information from March 2015 through March 2016.  (Docket 81-1 at pp. 8-9).  Those sources independently provided information corroborating each other.  Additionally, the information was corroborated by law enforcement's own observations of Mr. Bettelyoun's activities at a residence nearby his own, which law enforcement surveilled based on their belief individuals were engaged in narcotics distribution at the residence.  Id. at p. 9.  Although children were not found at Mr. Bettelyoun's residence during the June 3, 2016, wellness check conducted by Officers Archambault and Morgan as reported by the caller who requested the wellness check, the caller's report that individuals were using methamphetamine at Mr. Bettelyoun's residence was overall consistent with law enforcement's investigation into Mr. Bettelyoun.  Officers' Archambault's and Morgan's

12

observations of the four individuals at the defendant's residence during the June 3 wellness check led them to believe the individuals, including the defendant, were using methamphetamine at the time, which further corroborated the information gathered by the task force during their investigation into the defendant up until that time.  The information, all together, paints a picture of ongoing involvement by Mr. Bettelyoun in illegal narcotics activity leading up to the June 2016 search, with the older information corroborated over time by newer, consistent information.  The most recent information collected by law enforcement and included in the affidavit for the search warrant was from the June 3, 2016, wellness check, which occurred only four days prior to the issuance of the warrant and thirteen days prior to the execution of the warrant.  Again, in the totality of the circumstances, the information provided by law enforcement in the application for the June 2016 search warrant supports a finding that there was a fair probability evidence of illegal narcotics possession and distribution would be discovered at the defendant's residence and, therefore, probable cause existed for the June 2016 search of defendant's residence.  See Montgomery, 527 F.3d at 686.  Defendant's third objection is overruled.

**4. Admissibility of Statements by Defendant to Agents Hooper and Rasmussen on June 17, 2016, Based on Waiver of <u>Miranda</u> Rights**

Defendant's fourth objection essentially amounts to a claim that he did not voluntarily, knowingly and intelligently waive his <u>Miranda</u> rights prior to

making statements to Special Agent Hooper and South Dakota Division of Criminal Investigation Special Agent Rasmussen on June 17, 2016, while the defendant was in tribal custody.  A waiver is voluntary, knowing and intelligent if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the defendant has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).  A statement is involuntary if it is "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)).  Whether statements by a defendant were given voluntarily is "judged by the totality of the circumstances."  LeBrun, 363 F.3d at 724.  The court considers "the 'conduct of the officers and the characteristics of the accused.' "  Id. (quoting Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001)).  Ultimately, the government bears the burden of showing by a preponderance of the evidence that the statements at issue were voluntary.  LeBrun, 363 F.3d at 724.

Specifically, the defendant argues insufficient inquiry was made at the evidentiary hearing as to whether his statements were, in fact, voluntary based on his "intelligence, education, criminal history, or whether [he] was under the influence of drugs" at the time of questioning.  (Docket 98 at p. 2).  However,

statements made by a defendant who waives his Miranda rights while under the influence of drugs are not per se involuntary.  See United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (noting "sleeplessness, alcohol use and drug use" may be relevant to the voluntariness analysis, but "[i]ntoxication and fatigue do not automatically render a [statement] involuntary" (internal quotation omitted)).  Ultimately, a "defendant's mental condition alone is not enough to render a confession constitutionally involuntary; there must be coercive police activity."  LaRette v. Delo, 44 F.3d 681, 688-89 (8th Cir. 1995).

The facts surrounding the interview of the defendant by Agents Hooper and Rasmussen on June 17, 2016, are completely devoid of any indication of coercive police activity.  In fact, it was Mr. Bettelyoun himself who requested to speak with Agents Hooper and Rasmussen that day.  (Docket 92 at p. 12).  Had Mr. Bettelyoun not requested to speak to investigators, Agents Hooper and Rasmussen would not have interviewed Mr. Bettelyoun at all that day.  Id. at p. 13.  Furthermore, the interview occurred in a visitation room at the tribal jail which Agent Hooper described at the evidentiary hearing as "pretty spacious." Id. at p. 14.  The court finds Agent Hooper credible and has no reason to doubt his testimony in this regard.  Additionally, Mr. Bettelyoun was not handcuffed during the interview, nor were Agents Hooper and Rasmussen armed.  Id. at p. 15.  Before beginning the interview, Agent Hooper read Mr. Bettelyoun his Miranda rights from a form, asking Mr. Bettelyoun after he read each right whether Mr. Bettelyoun understood the right and checking a box for Mr.

15

Bettelyoun's response to each.  Id. at p. 16.  When Agent Hooper was done reading him all of his Miranda rights, Mr. Bettelyoun signed the form.  Id.  At no time during the interview did Mr. Bettelyoun request an attorney, and the interview concluded when Mr. Bettelyoun indicated to the agents that he did not wish to speak further.  Id. at pp. 17-18.  At the evidentiary hearing, Agent Hooper described Mr. Bettelyoun's demeanor throughout the interview as "calm" and stated Mr. Bettelyoun "appeared to understand what was going on, was cognitive of all the questions that . . . were ask[ed]" of him, and that Mr. Bettelyoun's "answers were coherent."  Id. at p. 19.

The court finds no evidence indicating Mr. Bettelyoun's cognition was impaired or that law enforcement acted in any manner even remotely coercive during the interview.  The fact Mr. Bettelyoun himself requested to speak with investigators that day and then subsequently signed the Miranda form after each of his rights were read to him is evidence the statements he made during the interview were the product of an entirely free and deliberate choice on his part and that his Miranda waiver was voluntary, knowing and intelligent.  See Jones, 23 F.3d at 1313.  Defendant fails to identify any evidence in the record regarding his "intelligence, education, criminal history, or whether [he] was under the influence of drugs" that might support a conclusion to the contrary. See Docket 98 at p. 2.  Defendant's fourth objection is overruled.

5. **Legality of Search Warrant Issued in September 2018 and Executed in October 2018**

Again, as stated above, "[f]or a search warrant to be valid the warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, [or] contraband . . . may be found in the place to be searched." Montgomery, 527 at 686 (quoting Proell, 485 F.3d at 430 (internal quotation omitted)).  "Probable cause means a 'fair probability' that the object of the search warrant may be found in the place to be searched.'" Montgomery, 527 F.3d at 686 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "This determination is made by considering the totality of the circumstances." Montgomery, 527 F.3d at 686.  Furthermore, "[i]n investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale."  Id. (internal quotations omitted).  Even information that is many months old is not stale if it is corroborated by more recent information. See supra pp. 11-12.

The search warrant issued on September 28, 2018, and executed on October 3, 2018, was based on information gathered by law enforcement over the course of about two and a half years which tied Mr. Bettelyoun to ongoing illegal narcotics activity.  In addition to information gathered by law enforcement from five SOIs from March 2015 to March 2016 relating to alleged

narcotics distribution by Mr. Bettelyoun, law enforcement also gathered corroborating information based on its own observations of Mr. Bettelyoun in 2016 and during the June 2016 search of Mr. Bettelyoun's residence, his arrest and his subsequent interview with Agents Hooper and Rasmussen at the tribal jail.  Then, in 2018, law enforcement conducted two controlled buys of methamphetamine from Mr. Bettelyoun, one on July 17 and the other on August 8.  Law enforcement subsequently received additional corroborating information from an SOI that Mr. Bettelyoun was engaging in narcotics distribution into September 2018.  In total, over the course of its investigation into Mr. Bettelyoun prior to his 2018 arrest, law enforcement gathered information pertaining to Mr. Bettelyoun's alleged involvement in drug distribution from seven separate sources, as well as from the personal observations of law enforcement officers themselves.

In light of the newer corroborating information gathered in 2018, the 2015 and 2016 information was not stale.  Furthermore, the cumulative evidence from March 2015 through September 2018 provided a sufficient basis for law enforcement to believe Mr. Bettelyoun was involved in illegal narcotics distribution when it applied for a search warrant at the end of September 2018 and for the magistrate judge to conclude there was a fair probability evidence of the defendant's alleged narcotics activity would be found at his residence when that search warrant was executed.  Therefore, probable cause supported the

issuance of the 2018 search warrant, and defendant's fifth objection is overruled.

### 6. Defendant's Alleged Effort to Hide During Execution of Search Warrant on October 3, 2018

Defendant makes a factual objection to the magistrate's characterization of his actions when law enforcement arrived at his property to execute the search warrant on October 3, 2018, as an attempt to hide.  At the evidentiary hearing, OST Criminal Investigator Derek Puckett testified that he and Officer Archambault, who were assisting the FBI with executing the search warrant on October 3, 2018, arrived at Mr. Bettelyoun's residence that morning and observed Mr. Bettelyoun mowing his grass.  (Docket 92 at p. 93).  Investigator Puckett testified that when Mr. Bettelyoun saw him and Officer Archambault pulling up on the north side of the property that Mr. Bettelyoun "got behind a barricade-type thing, which later was determined to be a playground."  Id. at p. 94.  Mr. Bettelyoun was "there for a brief moment," during which he was not visible to law enforcement.  Id.  "[W]hen he c[a]me back out, he approached" the two officers and was cooperative.  Id.  at pp. 94-97.  There is no evidence in the record that conflicts with Investigator Puckett's account.  The court finds Investigator Puckett's testimony credible and the magistrate's characterization of Mr. Bettelyoun's initial, albeit very brief, reaction to law enforcement's arrival at his residence that morning fair.  The matter ultimately has no bearing on the

legal analysis or outcome of defendant's motion to suppress.  Nevertheless, the defendant's objection is overruled.

### 7. Statements by Defendant to Agent Cooper on October 3, 2018, During Search of His Residence

Defendant argues the evidence does not establish he knowingly and intelligently waived his Miranda rights before he was questioned at his residence by Agent Dan Cooper on October 3, 2018, during law enforcement's execution of the search warrant.  Again, a waiver is voluntary, knowing and intelligent if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the defendant has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Jones, 23 F.3d at 1313.  A statement is involuntary if it is "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  LeBrun, 363 F.3d at 724 (quoting Bowersox, 235 F.3d at 1132).  Whether statements by a defendant were given voluntarily is "judged by the totality of the circumstances."  LeBrun, 363 F.3d at 724.  The court considers "the 'conduct of the officers and the characteristics of the accused.' " Id. (quoting Lawrence County, 260 F.3d at 952).  Ultimately, the government bears the burden of showing by a preponderance of the evidence that the statements at issue were voluntary.  LeBrun, 363 F.3d at 724.

20

Furthermore, statements made by a defendant who waives his Miranda rights while under the influence of drugs are not per se involuntary.  See Gaddy, 532 F.3d at 788 (noting "sleeplessness, alcohol use and drug use" may be relevant to the voluntariness analysis, but "[i]ntoxication and fatigue do not automatically render a [statement] involuntary" (internal quotation omitted)). Ultimately, a "defendant's mental condition alone is not enough to render a confession constitutionally involuntary; there must be coercive police activity." LaRette, 44 F.3d at 688-89.

Similar to his fourth objection relating to the June 2016 questioning, defendant argues here that there was "no inquiry" at the evidentiary hearing into whether his statements to Agent Cooper on October 3, 2018, were, in fact, voluntary based on his "intelligence, education, or criminal history," and he claims there was "insufficient evidence to conclude [he] was not under the influence of drugs or alcohol."  (Docket 98 at p. 2).

However, defendant points to no alleged coercive police activity surrounding Agent Cooper's questioning of the defendant on October 3, 2018, and the court finds the record completely devoid of evidence of any.  Officer Puckett and Agent Cooper, both of whom the court finds credible, testified at the evidentiary hearing that Mr. Bettelyoun did not appear intoxicated or impaired in any way during his interactions with them on October 3.  See Docket 92 at pp. 63 & 100.  The court does not find any other indication from the record that Mr. Bettelyoun was or could have been intoxicated or otherwise

21

impaired during his interactions with law enforcement that day.  Agent Cooper conducted the interview with Mr. Bettelyoun on October 3 inside his vehicle, parked at Mr. Bettelyoun's residence.  Id. at p. 59.  Agent Cooper began by advising Mr. Bettelyoun he was under arrest.  Id.  He placed Mr. Bettelyoun in the front passenger seat of the vehicle with his hands cuffed in front.  Id. at p. 61.  Although Agent Cooper was armed that day, his firearm remained in his hip holster during all times relevant to his questioning of Mr. Bettelyoun that day.  Id. at p. 62.  Inside the vehicle, Agent Cooper read an FBI advice of rights form to Mr. Bettelyoun, positioning the form so they both could see the form while Agent Cooper read it aloud.  Id. at pp. 65-66.  When Agent Cooper finished reading the form to Mr. Bettelyoun, he asked Mr. Bettelyoun if Mr. Bettelyoun understood the rights he had just been read.  Id. at p. 67.  Mr. Bettelyoun indicated he understood and had no questions.  Id.  Mr. Bettelyoun did not wish to sign the form, as Agent Cooper requested, but he nevertheless indicated to Agent Cooper that he understood his rights and agreed to speak with Agent Cooper at that time.  Id. at pp. 67-68.  The interview proceeded, and at no time during the interview did Mr. Bettelyoun request an attorney.  Id. at p. 68.  The interview concluded without any further questioning when Mr. Bettelyoun told Agent Cooper he did not want to talk anymore.  Id. at pp. 68-69.

The court finds nothing about the exchange between Agent Cooper and Mr. Bettelyoun in Agent Cooper's vehicle that day at the Bettelyoun residence

coercive.  Mr. Bettelyoun was fully advised of the situation and that he was under arrest, as well as his <u>Miranda</u> rights.  There is no evidence suggesting Mr. Bettelyoun was under the influence or otherwise impaired when he decided to speak with Agent Cooper.  Although he did not sign the advice of rights form, Mr. Bettelyoun's signature was not required when he nevertheless verbally agreed to speak with Agent Cooper.  Furthermore, the defendant does not identify nor does the court find anything about the questioning itself that would suggest coercion, and Agent Cooper promptly ended the interview without further questioning of Mr. Bettelyoun when Mr. Bettelyoun indicated he did not wish to speak anymore.  There is no evidence to suggest Mr. Bettelyoun's decision to speak with Agent Cooper at that time was anything but his own free and deliberate choice.  <u>See</u> <u>Jones</u>, 23 F.3d at 1313.  Defendant's seventh objection is overruled.

### 8. Reasonableness of 29-Hour Period Between Defendant's Arrest on October 3, 2018, and Defendant's Initial Appearance Before Magistrate Judge and Admissibility of Defendant's Statements During That Period

Federal Rule of Criminal Procedure 5 requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge . . . ."  Fed. R. Crim. P. 5(a)(1)(A).  The purpose of Rule 5 is to prevent law enforcement officers from detaining an arrested person for "an unnecessary period of time to enable the officer to extract a confession from the arrested individual."  <u>United States v. Cooke</u>, 853 F.3d

23

464, 471 (8th Cir. 2017).  Therefore, the "remedy for a violation of Rule 5(a)(1)(A) is . . . suppression of evidence illegally obtained as a result of the violation."  Id.

Mr. Bettelyoun was arrested pursuant to a federal warrant and transported to the Pine Ridge adult offender's facility at 8:30 on the morning of October 3, 2018, where he stayed during the duration of the execution of the search warrant at his residence.  He was subsequently transported to Rapid City that afternoon, and he had his initial appearance in front of Magistrate Judge Wollmann on October 5, 2018, at 1:21 p.m.  See Docket 9.  In total, the court finds just under 53 hours elapsed between Mr. Bettelyoun's arrest and his initial appearance.

The court does not find the 53-hour period prejudiced Mr. Bettelyoun in any way.  The only statements made by Mr. Bettelyoun to law enforcement which he challenges in his motion to suppress are statements he made to Agent Cooper during the interview that occurred in Agent Cooper's vehicle right after Mr. Bettelyoun was placed under arrest on the morning of October 3, 2018, and statements made by Mr. Bettelyoun during his transport to Rapid City later that afternoon.  Although the court does not find the 53-hour period an "unnecessary period of time" between Mr. Bettelyoun's arrest and his initial appearance, even if it did, all of Mr. Bettelyoun's statements to law enforcement identified in his motion to suppress were made the same day as his arrest and

therefore were not obtained as a result of any unnecessary delay.  See Cooke,
853 F.3d at 471.  Defendant's eighth objection is overruled.

### 9. Admissibility of Defendant's Statements to Agents Hooper and Rasmussen on June 17, 2016, Based on Nature of Custody

Defendant's ninth objection is closely related to his fourth and again
concerns the admissibility of his statements made during the June 17
interview at the tribal jail with Agents Hooper and Rasmussen.  He asserts he
should have been promptly taken before a federal magistrate judge because
there is no evidence showing he was charged in tribal court and, therefore, that
he was not in fact in federal custody on that date.  To the contrary, the only
information in the record and available to the court pertaining to the nature of
the custody is officer testimony, which the court finds credible, that Mr.
Bettelyoun was arrested by tribal authorities on June 16, 2016, on tribal
charges and that no federal arrest of Mr. Bettelyoun occurred nor were any
federal charges brought against him until 2018.  See e.g., Docket 92 at pp. 12-
13.  Defendant's assertion that he "was at all relevant times being investigated
by the Badlands Drug Task Force, which is comprised of" both federal and
tribal authorities, fails to support in any way his contention that he was
actually in federal custody on the date in question.  See Docket 98 at p. 3.  Nor
does the court find any other evidence presented at the evidentiary hearing or
in the parties' briefing that would support his contention.  Defendant's ninth
objection is overruled.

### 10. Permissibility of Search of Curtilage of and Out Buildings at Defendant's Residence Based on Search Warrant Executed on October 3, 2018

The "curtilage" is the "area immediately surrounding and associated with the home." Florida v. Jardines, 569 U.S. 1, 6 (2013).  The magistrate's search warrant did not need to define the term curtilage, as the defendant argues, for the warrant to be valid.  Furthermore, contrary to the defendant's contention that the search warrant did not define which buildings outside the residence were permitted to be searched, the warrant specifically described the location to be searched as Mr. Bettelyoun's residence and "*any* out-buildings and vehicles located within the curtilage area of th[e] residence."  (Docket 89 at p. 26) (emphasis added).  Photos of Mr. Bettelyoun's property admitted as exhibits at the evidentiary hearing show a play structure immediately adjacent to the residence in which law enforcement found boxes containing baggies of white powder and drug paraphernalia like a lighter and pipe.  See id. at pp. 67-70.  The play structure appears from the photos to be only a few yards from the residence. It is clearly within the area immediately surrounding and associated with the home—i.e., the curtilage—and, therefore, the location specifically described in the warrant was searchable.  The defendant has provided no evidence or argument otherwise.  Defendant's tenth objection is overruled.

26

### 11. Permissibility of Search and Seizure of Containers Found in Curtilage of Defendant's Residence on October 3, 2018, and the Seizure of the Contents of the Containers

"A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." United States v. Ross, 456 U.S. 798, 820-21 (1982).  A "warrant that authorizes an officer to search a home for illegal [narcotics] also provides authority to open closets, chests, drawers, and containers in which the [narcotics] may be found." Id.

Here, the search warrant expressly authorized the search and seizure of "[a]ll items determined to have been used or likely to be used for the packaging, weighing, transportation, shipping, use distribution, storage, or processing of any controlled substance, including safes," and any "[v]essels . . . used in connection with the manufacture, production, storage or dispensing of such drugs." (Docket 89 at p. 27).  Contrary to the defendant's contention that there "was absolutely no evidence upon which to base any conclusion that any containers . . . would contain illegal substances," as the magistrate judge observed, "[g]iven the fact that the Defendant immediately went to the playhouse [where law enforcement subsequently found the containers] upon seeing the officers, and the fact that the officers were there to execute a search warrant for evidence of drug trafficking, it was likely that any containers in that area would be used for storage of a controlled substance." (Dockets 98 at p. 2

27

& 97 at p. 23).  The court agrees with the magistrate judge that the search and seizure of the containers and their contents was well within the scope of the search warrant.  Defendant's eleventh objection is overruled.

### 12. Permissibility of the Search and Seizure of the Contents of Cell Phones Seized during October 3, 2018, Search

The search warrant executed on October 3, 2018, expressly permitted the seizure of "[c]ell phones, tablets, and computers capable of being used to facilitate or document the distribution, sales, trafficking, or possession of controlled substances along with *any and all information contained on these devices.*"  (Docket 89 at p. 28) (emphasis added).  Defendant's assertion that law enforcement needed to obtain another warrant to search the contents of the cell phones directly contradicts the plain language of the warrant.  Nor does defendant cite any authority for his contention.  Defendant's twelfth objection is overruled.

### 13. Admissibility of Defendant's Statements made on October 3, 2018, During His Transport from Pine Ridge to Rapid City Based on Waiver

Again, a waiver is voluntary, knowing and intelligent if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the defendant has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Jones, 23 F.3d at 1313.  A statement is involuntary if it is "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and

28

critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724
(quoting Bowersox, 235 F.3d at 1132).  Whether statements by a defendant
were given voluntarily is "judged by the totality of the circumstances." LeBrun,
363 F.3d at 724.  The court considers "the 'conduct of the officers and the
characteristics of the accused.' " Id. (quoting Lawrence County, 260 F.3d at
952).  Ultimately, the government bears the burden of showing by a
preponderance of the evidence that the statements at issue were voluntary.
LeBrun, 363 F.3d at 724.

The defendant suggested his confinement in the vehicle during the hour
and a half ride from Pine Ridge to Rapid City with Agent Cooper is inherently
coercive.  See Docket 93 at p. 2.  The court disagrees.  Confinement in a vehicle
is a necessary reality of traveling from Pine Ridge to Rapid City, which was
required for Mr. Bettelyoun to make his initial appearance before the
magistrate judge in this case.  Furthermore, as the magistrate judge observed,
"the overwhelming majority of the transport was spent in silence." (Docket 97
at p. 27).  The minimal communication between Agent Cooper and Mr.
Bettelyoun during the ride consisted of Agent Cooper answering questions
asked of him by Mr. Bettelyoun regarding logistics and procedure.  Agent
Cooper did not threaten or deceive Mr. Bettelyoun in any way, let alone initiate
any conversation about the substantive issues of Mr. Bettelyoun's arrest.
Agent Cooper's tone was not threatening.  There is nothing about the
interaction between Agent Cooper and Mr. Bettelyoun during Mr. Bettelyoun's

transport to Rapid City that suggests any statement by Mr. Bettelyoun was anything but voluntary.  Defendant's thirteenth objection is overruled.

### 14. Legality of the Same Magistrate Judge Who Issued the Warrants Executed at the Defendant's Residence in June 2016 and October 2018 and at Issue in Defendant's Motion to Suppress Conducting the Evidentiary Hearing on that Motion and Passing Upon the Warrants' Validity in her Report and Recommendation

The defendant has not identified nor is the court aware of any legal authority supporting defendant's proposition that it is improper for the same magistrate judge who issues a federal warrant to subsequently pass upon the warrant's validity or conduct an evidentiary hearing and issue an R&R on the admissibility of evidence seized during the execution of the warrant. Defendant's fourteenth objection is overruled.

## CONCLUSION

Based on the discussion above, the court finds the magistrate judge's factual and legal findings in her R&R are an accurate account of the events and an appropriate resolution of the issues raised in the defendant's motion to suppress.

## ORDER

Therefore, it is

ORDERED that defendant's objections to the report and recommendation (Docket 98) are overruled.

IT IS FURTHER ORDERED that the report and recommendation (Docket 97) is adopted.

30

IT IS FURTHER ORDERED that defendant's motion to suppress (Docket 75) is denied.

IT IS FURTHER ORDERED that a scheduling order shall issue.

Dated December 3, 2021.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE